## CORRECTION OF JOURNAL AFTER TERM.

Probate Court of Cuyahoga County.

In re Kate Farkash, Insane.

Decided, January, 1909.

*Records—Authority of the Court to Correct—Examination of Insane Patient by the Probate Court—Finding of the Court Entered on Journal—Motion to Strike out Alleged Interpolation—Presumption that it was Made by Authority—Nature of the Offense, if Unauthorized Interpolation was Made—Degree of Proof Required to Establish Criminal Intent.*

1. A court is without power to correct its journal after term, if the judgment complained of reads as the court intended it should read at the time it was made, notwithstanding in rendering the judgment a mistake of law, or fact, or both, was made.

2. Where the claim is made that the judgment was in correct form as originally entered upon the journal, but that some unauthorized person at a subsequent date interpolated certain matter for the purpose of affecting substantial rights, and the evidence tends to show that if any alteration was made it was done by one of the clerks of the court, a presumption arises that it was done under direction of the court; and as between the two theories, on the one hand that it was done by order of court, and on the other that it was done without authority and with malicious intent, the court must adopt the one compatible with innocence on the part of the one who made the change, unless reliable evidence of sufficient force to remove all rational uncertainty compels adoption of the theory involving moral turpitude.

*C. F. Morgan* and *M. A. Foran,* for the motion.
*White, Johnson, McCaslin & Cannon,* contra.

Hadden, J.

The motion is for an order to correct the record, by striking out the words "from personal examination of the patient at her residence, her condition being unsuitable for her appearance in court," on page 574 of journal 75 of this court, on the ground that those words were placed upon the journal without lawful authority, long after the death of the probate judge who signed

the journal for that day. The part of the journal entry claimed to be incorrect, reads as follows:

"Complaint having been filed according to law by a citizen of the county, inquest is duly held, and the court finds from personal examination of the patient at her residence, her condition being unsuitable for her appearance in court, and from the testimony of Dr. T. M: Belkowsky and others, that Kate Farkash is insane, and Dr. Belkowsky is ordered to make the certificate required by law, which is accordingly done."

And the record is, of course, an exact copy of it. So that if the motion is sustained, the journal entry so to be corrected will read as follows:

"Complaint having been filed according to law by a citizen of the county, inquest is duly held, and the court finds　*　*　* and from the testimony of Dr. T. M. Belkowsky and others, that Kate Farkash is insane, and Dr. Belkowsky is ordered to make the certificate required by law, which is accordingly done."

In support of the motion, the mover offered as a witness, one George F. Waters, who testified that after Mrs. Farkash was released from the state hospital, he made a copy of the record as it then appeared. He was unable to fix the date, nor was he positive whether it was before or after the death of the late Henry C. White, who was the probate judge at the time of the adjudication. He testified that he went over it carefully and took a copy; that he was very positive that the words "at her residence, her condition being unsuitable for her appearance in court" were not then in the record; that he took a copy of this record in long hand, which was afterwards transcribed on the typewriter and the original copy destroyed. He further testified that he made it at the instance of Mrs. Farkash, and that he gave her the typewritten copy.

The mover also called Nelson Farkash, her son, who testified that he saw the paper testified about by witness Waters; that he obtained it from his mother and brought it to the probate court office and compared it with the journal and found it compared word for word; that this was shortly after Waters gave it to his mother, not long after her discharge, but he was unable

to fix the time with reference to the time of the death of Judge
White; that later he examined the journal in question and found
it contained some words which were not there at the time of the
former comparison. He was unable to quote the words literally,
but the substance was that his mother's condition was not suit-
able, etc. He further testified that there were no erasures or
interlineations at the time of the first comparison, and that the
record as shown to him on the hearing was not in the same con-
dition then that it was when he made the original comparison;
that there were no erasures at the time of the original comparison
and the words "her condition not being suitable," etc., had been
added since that time. He further testified that the words "in
open court," which was a part of the journal entry at the time
of the comparison, had since been erased.

The mover also called as witness C. F. Morgan, who testified
that he was the attorney of the mover, and also her attorney in
a certain action in the court of common pleas of this county,
against one Fish, and that before he began that action he came
to this court and examined all the records in this matter, and
that this journal entry is not in the same shape now that it was
then. The journal entry when he examined it, stated that she
was examined in open court; that since that time these words had
been erased, and the words "at her residence" and the words
"condition being unsuitable for her appearance in court" have
been interlined. He further testified that his first examination
was subsequent to the death of Judge White and the second ex-
amination was shortly before the case (in the court of common
pleas) was being reached for trial; that he had examined the
records of the court, and found no entry ordering or directing the
making of such change.

The mover, Kate Farkash, also testified in her own behalf, that
the first time she ever saw Judge White was when her husband's
will was probated; that she never saw him again; that she con-
sulted with Waters about the examination of the journal entry
the same week she was released from the Cleveland State Hos-
pital, and that her action against Fish was brought in March,
1905, and that Judge White died in January, 1905.

An inspection of the journal and the record of the case shows, that in each an erasure was made by the use of a knife or some other sharp instrument, at the place where the words "at her residence" and the additional word "her" are now written, and that the words "condition being unsuitable for her appearance in court" were written above the line with a caret beneath the line, indicating that they were to be read immediately after the words last quoted.

The above is all the testimony offered in support of the motion and when the mover rested, motion was made by White, Johnson, McCaslin & Cannon, representing Fish, to dismiss the application.

There are two statements of fact in the words alleged to have been interpolated, and which Mrs. Farkash asks to be stricken out. They are: first, that there was a personal examination of her at her residence; and second, that her condition was unsuitable for her appearance in court.

The materiality of these findings is made apparent by an inspection of the requirements of Section 703 of the Revised Statutes, which provides, among other things, that the warrant, issued in an insane inquest, shall command the person to whom it is issued to bring the person alleged to be insane before the judge; provided that, if by reason of the character of the affliction or insanity of such person, it is deemed unsuitable or improper to bring such person into court, then the probate judge shall personally visit such person, and certify that he has so ascertained the condition of the person by actual inspection.

It is therefore necessary that the probate judge shall see the patient, ordinarily in court; but in the exceptional cases above provided for, at any other place where the patient may be.

A careful examination of the testimony shows nothing therein tending to prove either the truth or the falsity of the second interpolated finding, namely, that the patient's condition was unsuitable for her appearance in court.

Her attorneys claim to have established the falsity of the first finding, to-wit; that there was a personal examination of her at her residence, and this claim is based upon the testimony of Mrs.

Farkash, that she never saw Judge White but once, and that was on the occasion when her husband's will was probated.

Without now inquiring whether that testimony proves all that is claimed for it, assuming, without now deciding that it does, and that it is established that there was no personal examination of Mrs. Farkash by Judge White at her residence, the question arises: for what purpose and to what extent can this conclusion be used? Has this court any power, after the term, to change that journal entry for the sole reason that it is now discovered that it contains an incorrect, or false, or erroneous statement.

The cases cited in the brief of the attorney for Mrs. Farkash, throw some light upon this question. In the case of *Hollister et al* v. *The Judges,* 8 Ohio State, 202, the substance of the court's holding is, that the errors which the court has power to direct the clerk to correct are either clerical, or such as may arise by fraudulent or improper alteration or mutilation of its files or records. There is no hint that the court has the power to correct errors in judgment made by the court itself. It is elementary that exceptions, motions for new trials, petitions in error and appeals, are the ways pointed out by law, and usually resorted to, for correcting the mistakes of a court.

In the case of *Gill* v. *Pelky,* 54 Ohio State, 348, it was sought to correct a mistake made in the return of an appraisement in a land sale proceeding in the probate court. The powers of a court of general equity jurisdiction were invoked to correct this mistake, and the Supreme Court he'd that it could be done on proper proof that it was a mistake, inasmuch as the party did "not seek a corrction of an error of judgment in the probate court. No ruling of that court was attacked on the ground that it was erroneous. Any attempt to do that must have failed. For the power to correct errors of law committed by other courts, does not lie within the province of courts of equity," etc.

In the case of *Jackson* v. *Adams,* 56 Ohio State, 397, the court laid down the rule that the power of the courts to correct their records exists, and it is restricted to placing on the record evidence of judicial action which has been actually taken; that it can be exercised only to supply omissions in the exercise of functions that are clerical merely.

These views of the law are in harmony with the proposition laid down in argument in this case by attorneys for Fish, namely, that a court can of its own motion, at any time, change the journal to make it read as he intended it should read at the time he made the order, and it is immaterial whether the failure of the journal to read as he intended it should, was due to his mistake, in announcing or recording his decision, or to the mistake of a clerk, or to the inter-meddling of a trespasser. So that, if the journal reads now as the court that rendered the judgment intended it should read, even though that court made a mistake of fact or of law or of both, in formulating its judgment or order, the court making that mistake has no power after the term to change that entry.

This doctrine we find clearly stated in the foot-note to Section 53 of Rockel's Probate Practice, where this language is used:

"Of course in no instance can a journal entry be changed so as to constitute a different decision from that which was actually, in the then intention of the judge rendered, but, where the journal does not state the actual decision, either by reason of mistake or fraud or inadvertence, then the judge ought, at any time to correct such entry to conform to the truth," etc.

As further authority in support of this proposition Section 156 of Black on Judgments, Second Edition, was quoted in argument to the following effect:

"In regard to the power of amending judgments by supplying omissions, it is necessary not to lose sight of the principle that amendments can only be allowed for the purpose of making the record conform to the truth, not for the purpose of revising and changing the judgment. Hence, if any thing has been omitted from the judgment, which is necessarily or properly a part of it, and which was intended and understood to be a part of it, but failed to be incorporated in it through the neglect or inadvertence of the court or the clerk, then the omission may be supplied by an amendment after the term. If, on the other hand, the proposed addition is a mere after thought, and formed no part of the judgment, as originally intended and pronounced, it can not be brought in by way of amendment."

This exact question has been before this court in the case of *Ellen Hunt, insane,* and the motion to correct and vacate the journal entry was overruled. Thereupon an appeal was taken, and the certified copy of the journal entry on file in this court, shows that the common pleas court found that the petitioner was not entitled to the relief asked for; and that she gave notice of appeal to the circuit court and her appeal bond was duly fixed. I have been informed that the circuit court held that the case was not appealable, and therefore did not hear the case. Later, practically the same motion was made in this court, which was again overruled; appeal was taken therefrom and the court of common pleas granted petitioner's prayer, and ordered the record in this court corrected to conform to the facts as alleged by the petitioner.

I have been informed however by a messenger whom I regard as trustworthy, that the judge of the court of common pleas who heard the matter and made the order, wanted it distinctly understood that it was made not because there was law for it, but as a matter of mental sanitation, necessary for the well being of the lady who made the motion.

I am therefore brought to the conclusion that the mere inaccuracy, falsity or error in the journal entry, conceding it to exist as claimed, does not authorize the court, at this time, to make the correction asked for. Something more is necessary. It must also appear that it was not the finding and judgment which the court intended to make, and that resolves itself into three possible situations: first, that the court announced one finding when he intended to announce another, and the announcement was correctly recorded; or second, that he was misunderstood by the clerk, and the judgment which he announced was not recorded, but that another was; or third, that some one, at least mischievously and perhaps criminally, has tampered with the journal of this court.

It is the claim of Mrs. Farkash's attorneys that no mistake was made in rendering the judgment as originally journalized, and that no mistake was made in recording the judgment which was actually rendered, but that some unauthorized person, some intermeddler, for the purpose of affecting the substantial rights

of Mrs. Farkash and Mr. Fish, has made all the changes that were made in this journal entry, and they insist that the untruthfulness of the interpolated matter tends to show that it was not an alteration directed by the court.

There is no escape from this proposition, namely, that if this conclusion is reached, it amounts to a finding that some one has committed a felony. For that that sort of tampering with the records would be a felony, clearly appears from Section 7092$a$ of the Revised Statutes of Ohio, which provides that—

"Whoever falsely makes, alters, forges, or counterfeits the record of any proceeding, judgment, decree, entry or any part of the record of any judicial proceeding, required by law to be made in any action or other proceeding of any court in this state, *is guilty of forgery*, and upon conviction thereof, shall be imprisoned in the penitentiary not more than twenty years nor less than one year."

. It is familiar law, heard every day in the courts, that there is no presumption that any one has committed a crime. The court in dealing with testimony must proceed upon the presumption of innocence, until it is destroyed by evidence of such character as to clearly prove guilt.

It then becomes the duty of the court to examine with care the evidence relied upon to establish this proposition. We must take into consideration, in the first place, the fact above mentioned that the alterations appear to be in the same handwriting as the rest of the entry and the record, which would justify the conclusion that they were made by a journal clerk and by a record clerk of this court. There is no proof tending to show that they were not thus made. We have then the case of alterations in journal and record, not made by strangers and outsiders, but by those members of the clerical force who would naturally make them in pursuance of their duties and in pursuance of the order of the court. There is no testimony tending to show that they did not make them in pursuance of either general or specific directions, and in accordance with their duties; in other words, there is no testimony tending to show that the alterations were made at the instance or request of some one having no right or authority in the premises.

In the next place, going to the testimony tending to show the falsity of so much of the finding as locates the inquest at the residence of the patient, what is its extent? What does it amount to? This, and only this, that Mrs. Farkash didn't see Probate Judge Henry C. White at her residence. But was it necessary, for all the purposes of a legal inquest, that she should see him? It was necessary and imperatively necessary that *he should see her*. The statute requires actual inspection on his part, but it does not require that the patient shall inspect the judge or shall be conscious of the judge's inspection.

I am not assuming that Mrs. Farkash was insane; for that of course is strenuously denied by her and counsel representing her. I think it is a circumstance, however, that should be considered and should have some weight as bearing upon her credibility as a witness, that she was an inmate of the state hospital for a period of some months, commencing just after the date of the inquest, and that those in charge of her at that institution received her as one needing the treatment or restraint there afforded, or both, and that they kept her there during that period. To put it another way: If she was a perfectly sane person when she was taken there, that condition would have been quickly observed, and in the regular course of things she would have been promptly discharged. For during a period beginning earlier than 1904, it has been the settled policy of all state hospitals in Ohio (and especially the Cleveland State Hospital) to discharge patients just as soon as their condition would render it safe to do so.

If, instead of a motion to correct the record, the case at bar were an indictment against one or more individuals, charging them with a violation of the section of the statute I have quoted, with this testimony alone supporting it, could a fair and impartial jury say that the averments of the indictment had been proved beyond a reasonable doubt?

If the theory that these interlineations were made by an intermeddler, was the only tenable or probable theory, perhaps the jury might be forced to the conclusion of guilt. But that is not the situation here. It was within the legal power and discretion of Judge White, as we have seen, if the entry did not

express the judgment which he intended it should express when he signed the journal of that day, to direct it to be so modified and amended that it would do so.  And if he did give such direction, it was entirely immaterial whether the correction was made the day he ordered it to be done, or any time thereafter.  It would still be his correction.  This is theory and theory only. But it is a theory in accordance with law and established practice and would account for all of the phenomena of these alterations, made at the time it is claimed by Mrs. Farkash that they were made.

And as between these theories, the court is obliged to follow that one compatible with absence of guilt, until reliable evidence of sufficient force to remove all rational uncertainty has compelled it to adopt the theory involving moral turpitude, if not legal guilt.  On the hearing it was suggested by counsel for Mrs. Farkash that the court should, of its own motion, go somewhat outside of the rules of evidence, and for the sake of the integrity of the journal and record of the court institute an investigation, which, in a search for facts, would be unincumbered by the strict rules of evidence.  But as above remarked the disposition of this matter has an important, perhaps a material bearing, upon the substantial rights of the parties before the court, and until those parties have waived their rights to the protection afforded by the rules of evidence this court has no right to disregard them.  And, therefore, in the disposition of this matter I have heard and seen nothing but the testimony in evidence, produced in open court in the presence of counsel for both sides, and the files, journal entry, records and docket relating to this proceeding in this court, with this single exception :  I have positive knowledge that no order was made by me with regard to any amendment, modification or interlineation on the journal and record of this case.

Entertaining these views and with this situation of the testimony, I am unable to see my way clear to the granting of this motion, and it will therefore be overruled.